IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| Plaintiff, | : | NO. 10-703 |
| | : | |
| | : | |
| V. | : | |
| | : | |
| | : | |
| NATHANIEL PITTS, | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                    OCTOBER 28, 2011

I.    **INTRODUCTION**

        Defendant Nathaniel Pitts ("Defendant") was convicted

on June 9, 2011, of the following five federal crimes:

Count 1: Knowingly and intentionally possessing with intent to

distribute a mixture and substance containing a detectable amount

of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

Count 2: Knowingly and intentionally possessing with intent to

distribute a mixture and substance containing a detectable amount

of cocaine base, crack cocaine, in violation of 21 U.S.C. §

841(a)(1), (b)(1)(C). Count 3: Knowingly and intentionally

possessing with intent to distribute a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). Count 4: Knowingly possessing a firearm and ammunition in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, in violation of 18 U.S.C. § 924(c)(1). Count 5: Having been convicted in the Eastern District of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year, knowingly possessing a firearm, in violation of 18 U.S.C. § 922(g)(1).

Before the Court are Defendant's post-trial motions for a new trial and for judgment of acquittal. For the following reasons, Defendant's motions will be denied.

## II.  BACKGROUND

### A.  Relevant Facts

On September 13, 2010, Drug Enforcement Task Force Officer Oswaldo Toledo ("Agent Toledo") and other officers conducted surveillance on Defendant. (Hearing 17:12-14.) The surveillance was coordinated by an air wing unit. (Hearing 17:9-16.) The surveillance was prompted by information received from a confidential informant who indicated that Defendant was a drug trafficker in Philadelphia. (Hearing 18:8-18.) Agent Toledo

testified that this source also described the vehicles Defendant was operating, the location of hidden compartments in the vehicles, the location of Defendant's residence, and the fact that Defendant previously did federal time for drug trafficking. (Hearing 19:18-25; 21:5-25.) Agent Toledo testified that he relied on this informant because the informant previously provided reliable information, and Agent Toledo was able to corroborate the information provided by the informant. (Hearing 19:1-16.)

At 3:00 p.m. the officers observed Defendant arrive at his residence in one of the vehicles described by the informant—a GMC Envoy. (Hearing 22:15-20.) Defendant then entered his residence, but fifteen minutes later he exited and changed the battery in a white Jetta. (Hearing 23:1-6; 43:10-12; 44:10-18.) Once the battery was changed, Defendant entered his GMC Envoy, "circled the block," and parked the GMC Envoy directly across from his residence.[11] (Hearing 23:7-12.)  At the hearing, Agent Toledo explained to the Court that "circling the block" is a "counter-surveillance technique that a lot of drug traffickers use to identify if any law enforcement officers are conducting surveillance on them." (Hearing 23:8-12.)

---

[11]    Although Defendant's counsel suggested Defendant was merely moving his car rather than "circling," the Court heard testimony from only Agent Toledo on this matter.  (Hearing 52:12-25.)

After Defendant parked his Envoy in front of his home, he entered his house. (Hearing 23:19-20.) Defendant was then observed, on a couple occasions, exiting his house, looking around, and going back into his house. (Hearing 53:2-5.) At one point, Defendant was observed entering his GMC Envoy. (Hearing 56:1-5.) Surveillance followed Defendant to a Deals parking lot. (Hearing 24:5-8.) Once at the parking lot, a black SUV (the "Black SUV") parked behind Defendant. (Hearing 24:14-20.) The driver of the Black SUV exited the SUV and went to the passenger side of Defendant's Envoy. (Hearing 24:17-20.) The driver of the Black SUV and Defendant were in the Envoy for approximately sixteen minutes. Id. The driver of the Black SUV then went back into his car and Defendant and the driver of the Black SUV simultaneously exited the parking lot and went in separate directions. (Hearing 25:1-2.)

Once the cars exited the Deals parking lot, Agent Toledo contacted Philadelphia Police and requested that the Black SUV and Defendant's vehicle be stopped. (Hearing 25:12-14.) Defendant immediately stopped when police directed him to, but the Black SUV led the officers on a high-speed chase. (Hearing 26-27.) The air wing lost the SUV, and Agent Toledo called off the chase. (Hearing 27:13-24.) The Black SUV was eventually located, and it was searched. (Hearing 71:24-25.) No drug

paraphernalia was found inside the SUV, but ammunition was found. (Hearing 73:1-14.)

After calling off the chase, Agent Toledo went to where Defendant was stopped. When Agent Toledo arrived at Defendant's location, Agent Toledo talked with the officers on the scene and was informed that Defendant had been compliant by providing his driver's license, insurance card, and registration. Also, Agent Toledo was told Defendant was acting nervous. (Hearing 29:3-10.) After receiving this information, Agent Toledo approached Defendant and advised Defendant that he was part of an investigation. Id. Agent Toledo asked Defendant for consent to search his vehicle, but Defendant denied. (Hearing 87:1-10.) Ten to fifteen minutes after Agent Toledo arrived on the scene, he requested a sniffing drug dog. (Hearing 30:17-25.) Once Agent Toledo was told a drug dog had been called, Defendant was ordered out of his car, frisked, placed in handcuffs, and placed in the back of a squad car. (Hearing 89:11-25; 90:1-25.) Agent Toledo testified that, at this point, Defendant was not free to leave because he was being detained. (Hearing 90:25; 91:1-7.)

Defendant was detained, in the back of the police car, for approximately two hours until the K-9 unit arrived. (Hearing 97-99.) Once the K-9 unit arrived, an exterior sniff of Defendant's vehicle was performed and the dog alerted to the

smell of narcotics. (Hearing 101:14-15.) Agent Toledo then sought
and received a search warrant for the vehicle. A search was
executed and officers uncovered a black briefcase containing
cocaine, U.S. currency, cocaine in tupperware, and cocaine in a
clear plastic bag.  Following this search, Agent Toledo received
a search warrant for Defendant's home and executed it that
evening.  Inside Defendant's home, the officers found a loaded
handgun underneath a table, a black bag with $84,600, marijuana,
crack cocaine, a kilo press, and tires that had been cut off at
the rims.  After the search of the home, Agent Toledo sought and
obtained two federal search warrants for two other cars
associated with Defendant, and Defendant's bank account.

     B.   <u>Motions Before Trial</u>

     On December 16, 2010, Defendant filed a motion to
suppress the physical evidence seized from the automobile he was
operating, his home, his bank account, and the two other
automobiles searched after execution of the search warrant for
his home.  On March 15, 2011, the Court issued a written
memorandum and order denying the Defendant's motion to suppress.
(Doc. nos. 37, 38.) In this written opinion, the Court found both
that law enforcement officers had reasonable suspicion to conduct
the initial traffic stop of the Defendant and probable cause to

arrest him before the K-9 unit arrived at the scene. (<u>See</u> Doc. No. 37 at 18.)

On May 5, 2011, Defendant filed a motion to re-open the suppression hearing, claiming that Agent Toledo had lied about entering Defendant's vehicle only after the K-9 unit arrived and requesting that the Court enter an order requiring the government to produce cellular telephone records for Agent Toledo at the hearing. (<u>See</u> Doc. No. 44 at ¶¶ 5 & 12.) During the argument on the defense motion, defense counsel argued that this Court had erred in denying the motion to suppress because <u>Arizona v. Gant</u>, 129 S. Ct. 1710, 1721 (2009), the case upon which the Court principally relied in its opinion, was not applicable to the facts. Specifically, he argued that although <u>Gant</u> authorized searches of vehicles incident to an occupant's arrest for evidence of the offense of arrest, <u>Gant</u> did not apply because the Defendant had not been arrested at the time his car was searched. (Doc. No. 76, 6:13-25.)

In denying Defendant's motion to re-open the suppression hearing, the Court found that the motion was largely an effort to reargue the Court's ruling on the motion to suppress. <u>Id.</u> at 23:12-17. The Court reiterated its holding that the officers' initial stop of Defendant's vehicle was justified by reasonable suspicion, and later as a consequence of additional

information, the officers had probable cause to arrest Defendant for engaging in a narcotics transaction. Id. at 23:17-25. Furthermore, the Court held that Arizona v. Gant was applicable because the Defendant objectively had been placed under arrest because a reasonable person under the circumstances would not believe he was free to leave. See Berkemer v. McCarty, 468 U.S. 420, 436 (1984). Given that the Defendant had lawfully been placed under arrest, the Court held that under Gant, Agent Toledo was authorized to search the vehicle without a warrant because he had reason to believe that it contained evidence of the offense of arrest, that is, drug trafficking. (Doc. No. 76, 23:25-24:1-22.)

C. Trial

At trial the government presented testimony from various witnesses, including the Defendant's girlfriend Jessica Vasquez, (Doc. No. 77, 225:21-236:15), DEA Special Agents Stephen Jenkins, Frank Costobile, and Randy Updegraff, (Doc. No. 78, 71:4-93:15, 108:21-187:7), and Agent Toledo.[22] Id. 203:17-225:23.

---

[22] The government also presented testimony from retired DEA Officer Joseph Rudy about aerial surveillance he conducted of the Defendant on September 13, 2010 (Doc. No. 77, 32:1-60:10); Philadelphia Police Officer Robert Donnelly about conducting the traffic stop of the Defendant, id. 61:17-85:25; Police Lt. Thomas MacCartney about his observations and conversations with the Defendant at the scene of the traffic stop, id. 86:10-108:10; Officer John Brady about executing the search warrant for Defendant's GMC Envoy, which resulted in finding cocaine powder, a hidden compartment containing about $31,495 in cash, and drug paraphernalia, including a kilo press and hollowed-out tires at Defendant's residence, id. 108:21-181:19; Police Officer Scott Dinsmore about leading a K-9 officer to conduct a sniff of Defendant's car which led to the discovery of cocaine, as well as through Defendant's residence, which led to the discovery of marijuana, crack cocaine, and drug trafficking paraphernalia, id. 182:1-196:13; DEA Chemist Vadim Astrakhan about his expert opinions that items seized from Pitts's car contained cocaine powder and

Ms. Vasquez testified that she had shared a home with the Defendant but was not living in that home in September 2010. (Doc. No. 77, 226:5-227:12.) She further stated that not only had she never kept any drugs or guns in the house, but also she had never seen the Defendant use cocaine powder, crack cocaine, or marijuana, and the Defendant never told her that he used any of those drugs. Id. 228:25-229:24, 233:11-15.

Special Agent Jenkins testified, among other things, that he participated in the execution of the search warrant at the Defendant's home on September 14, 2010, and found a handgun located in the living room under a coffee table. (Doc. No. 78, 72:16-73:24.) Special Agent Jenkins also testified that the gun was a Kel-Tek, 9-millimeter handgun and was loaded. Id. at 75:1-77:12. On cross-examination, defense counsel tried to ask Special Agent Jenkins what the Defendant knew or expected on September 13, 2010, see id. at 91:12-16; whether other homeowners owned a 9-millimeter, Kel-Tek handgun, id. at 91:19-21; and whether Special Agent Jenkins owned a gun, id. at 91:25. The government objected to each of these questions and the Court sustained those

items seized from Defendant's house contained crack cocaine and marijuana, id. 211:1-225:9; Detective Peter Dailey about finding a bag filled with $100 bills in Defendant's living room, Doc. No. 78, 47:22-64:8; Detective Donald Bailey about determining that the money seized from Defendant's car totaled $31,495 and the money seized from Defendant's home totaled $84,600, id. 65:10-70:23; DEA Special Agent William Schohn, as a firearms expert, about the operability of the firearm found in Defendant's home, id. 94:4-106:7; and DEA AGENT Eugene Zurybida about finding hidden compartments in Defendant's cars, id. 94:4-106:7.

objections. At a sidebar conference, the Court explained that there was no foundation for any of the defense questions, and that if the defense wanted to suggest that Defendant could not have placed the gun under the coffee table, he could present other witnesses with personal knowledge or argue to the jury that the agent's testimony was absurd. Id. at 93:4-11.

Special Agent Costobile testified, among other things, that he found a black gun holster in an upstairs bedroom during the search of Defendant's home. Id. at 115:3-21. Special Agent Costobile said that he was familiar with the gun that had been found in the house and that it fit "securely" into the holster he had discovered. Id. at 125:2-14. On cross-examination, defense counsel tried to ask Special Agent Costobile the same questions that had drawn sustained objections when defense counsel asked them of Special Agent Jenkins. Id. at 129:1-18. The government again objected, and the Court again sustained the objections. Id.

Special Agent Updegraff was tendered and accepted as an expert witness in the field of narcotics trafficking. Id. at 143:5-12. Among other things, Special Agent Updegraff opined that some of the items found during the search of Defendant's home, like a digital scale, a hydraulic press, and hollowed-out car tires, were often used by drug traffickers in furtherance of

their drug trafficking activities. <u>See</u> <u>id.</u> at 145:4-151:21.
Special Agent Updegraff also opined that the approximately 129.2
grams of cocaine found in Defendant's car was "consistent with
distribution quantities," <u>id.</u> at 154:6-19; that the marijuana
recovered from Defendant's house was "possessed with intent to
distribute," <u>id.</u> at 155:10-18; and that drug traffickers often
use firearms to protect themselves, their proceeds, and their
illegal drugs from rival traffickers. <u>Id.</u> at 156:9-19. Special
Agent Updegraff said drug traffickers do not always carry guns on
their persons or store them near the contraband or drug proceeds,
and that the key is "accessibility." <u>Id.</u> at 156:20- 158:7.

On cross-examination, Special Agent Updegraff testified
that he could not determine whether a small quantity of crack
cocaine was held for the purposes of distribution without knowing
the "totality of the circumstances," such as how it was packaged.
<u>Id.</u> at 177:8-19. Special Agent Updegraff then was shown the
specific bag of crack cocaine recovered from Defendant's kitchen
and said that it "doesn't look like a small street level
distribution bag." <u>Id.</u> at 177:23-178:16. He said that he could
not render an opinion as to whether the crack cocaine was
intended for distribution solely by looking at what defense
counsel represented was its packaging. <u>Id.</u> at 179:2-4. On
redirect, Special Agent Updegraff opined that "if narcotics are

being trafficked, narcotics are being stored, repackaged, manufactured in a residence, and there's a firearm in the residence, that firearm is being made available to protect the drugs and the drug proceeds, and the actor." Id. at 186:22-187:1.

Agent Toledo testified, among other things, that he oversaw the collection of all the evidence seized during the execution of the search warrants for Defendant's car and home. Id. at 224:12-14. Agent Toledo said that at no time did he or any of the other officers or agents find a crack pipe or tin foil that looked burnt as if it had been used to smoke crack cocaine. Id. at 224:18-225:6. AGENT Toledo said the searches also uncovered no evidence of personal use of cocaine or marijuana. Id. at 225:7-19. AGENT Toledo also testified that during the traffic stop of Defendant's car, he had a casual conversation with Defendant about boxing, and that during this conversation, Defendant told him that he did not personally do drugs. Id. at 213:17-224:3.

During cross-examination, AGENT Toledo testified that at some point during the traffic stop, officers recovered two cellular telephones belonging to Defendant. (Doc. No. 79, 31:25 - 32:25.) AGENT Toledo obtained warrants to search those cellular telephones for information including recorded conversations. Id. at 33:10-13. However, one of the cellular telephones had a

password protection, so AGENT Toledo could not access it, and the other one had no retrievable conversations. Id. at 34:22-35:11.

At the close of the government's case, the defense orally moved for judgment of acquittal, pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure. Id. at 58:17-59:22. The Court denied that motion. Id. at 61:12.

The defense then presented testimony from several witnesses, including the Defendant, himself. See generally id. at 62:1-269:5. During his cross-examination, Defendant testified that as of September 2010, at the time of the traffic stop, he was not personally using crack cocaine, cocaine powder, or marijuana, and had no intention to start using any of those drugs. Id. at 166:6-168:4. Defendant testified that any controlled substances found in his car and home would not have been for his personal use. Id.

Defendant further testified that two cellular telephones had been obtained from his car during the traffic stop and said that one was a "Lotus" and the other was an "HTC Hero." Id. at 195:16:23. Defendant said that he had used the Lotus phone to record the events that were going on at the time of the traffic stop. Id. at 196:1-2. Defendant said he began the recording after the officer who stopped him told him that police were investigating a report of someone smoking crack cocaine in a

parking lot. Id. at 197:5-25. He stated he concurrently placed a telephone call to a woman named Dominique Brower on the HTC Hero phone. Id. at 200:5-15. Defendant said that at some point, he stopped recording with the Lotus phone and dialed 9-1-1 to complain about being pulled over. Id. at 202-6-15. He said that after the 9-1-1 call was over, he pressed record again on the Lotus telephone. Id. at 202:25-203:4.

Defendant said that the HTC Hero phone was password protected, meaning that in order to access the phone, the user had to enter a password first. Id. at 204:9-13. Defendant was then asked to state his password in front of the jury. Id. at 204:14-15. Defendant first said the password "wasn't a number; it was a design," id. at 204:16 and then said he "would have to see the phone" in order to enter the password. Id. at 204:18. The government then presented Defendant with the HTC Hero phone. Id. at 204:25-205:1. Defendant was unable to access the phone. Id. at 205:2 -206:8. He said it had been "deactivated, so I don't know how to use this one." Id. at 206:2-3. Defendant also said that he did not remember whether the Lotus phone had some password protection that required the user to enter a PIN in order to access the video and audio recordings. Id. at 205:13-21.

AGENT Toledo later re-took the witness stand and testified that when he tried to execute the warrant to search the

14

Lotus phone for video and audio recordings, he was asked to enter a four-digit PIN. (Doc. No. 81, 11:1-2.) AGENT Toledo said he did not know the PIN so he could not access the recordings. Id. at 11:3-4.

Prior to closing arguments, defense counsel asked that the Court include a "spoliation charge" in its instructions to the jury, based on the failure of the government to produce the conversations that Defendant claimed he had recorded on his cellular telephone.(Document No. 80, 34:1-18.) The Court took the request under advisement at the time, id. at 34:20-21. Although the Court did not formally rule on the motion, it did not include the charge in its jury instructions proposed to counsel before the charge, and ultimately no spoliation instruction was given. (See Doc. 81 at 76-107.) After the jury was charged, defense counsel advised the court that there were no objections to the jury charge. Id. at 108:3-5.

Based on the parties' agreed upon stipulation, the Court agreed to bifurcate the trial, only allowing the jury to consider the felon-in-possession charge after it had rendered its verdict on the other four counts. (Doc. No. 76, 29:7-30:10.) On June 9, 2011, the jury found the Defendant guilty on all four counts. The second phase of the trial was then held before the same jury concerning the felon-in-possession of a firearm charge

and the jury subsequently found the Defendant guilty on that count as well. (Doc. No. 82, 11:10-63:19.)

## III. POST-TRIAL MOTIONS

In Defendant's post-trial motions,[3] Defendant argues that he is entitled to a new trial because fundamental errors occurred at trial to prejudice his case. Defendant also asserts that the government's evidence is insufficient to sustain his guilt beyond reasonable doubt on Counts 2 and 4. For the following reasons, Defendant's motions are denied.

A.    Legal Standards Of Review

Pursuant to Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may, in its discretion, "grant a defendant a new trial only if it finds that 'there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" United States v. Rich, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004) (quoting United States v. Johnson, 302 F.3d 139, 150 (3d Cir.

---

[3] Defendant does not specify in his motion what particular forms of relief he is seeking. His motion consists of eleven numbered paragraphs. (See Doc. no. 94.) Absent clarification from the Defendant, the Court construes the Defendant's motion to be a request for a new trial pursuant to Rule 33 and a renewed motion for judgment of acquittal under Rule 29.

2002)). Where multiple errors are alleged, a new trial may be granted only where the errors, "'when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" United States v. Copple, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (quoting United States v. Thornton, 1 F.3d 149, 156 (3d Cir. 1993)). Consequently, harmless errors that do not deprive the defendant of a fair trial are not a basis for granting a defendant's Rule 33 motion. See id. Although this standard is broader than the standard for acquittal under Rule 29, motions for a new trial are disfavored and "only granted with great caution and at the discretion of the trial court." United States v. Martinez, 69 F. App'x 513, 516 (3d Cir. 2003).

In deciding a motion for a judgment of acquittal under Rule 29, the court views the evidence introduced at trial in the light most favorable to the government and upholds the jury's verdict so long as any rational trier of fact "'could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (quoting United States v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001)). "The court is required to 'draw all reasonable inferences in favor of the jury's verdict.'" Id. (quoting United States v. Anderskow, 88 F.3d 245, 251 (3d Cir.1996)). The court may not "usurp the role of the jury" by weighing the evidence or

assessing the credibility of witnesses. United States v. Brodie,
403 F.3d 123, 133 (3d Cir. 2005) (citing United States v.
Jannotti, 673 F.2d 578, 581 (3d Cir. 1982) (en banc); and 2A
Charles A. Wright, Federal Practice & Procedure (Crim. 3d) § 467,
at 311 (2000)). Thus, the defendant bears an "extremely high"
burden when challenging the sufficiency of the evidence
supporting a jury verdict, United States v. Iglesias, 535 F.3d
150, 155 (3d Cir. 2008) (internal marks omitted) (quoting United
States v. Lore, 430 F.3d 190, 203–04 (3d Cir. 2005)), and the
government "may defeat a sufficiency-of-the-evidence challenge on
circumstantial evidence alone." Id. at 156 (citing United States
v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006)). A finding of
insufficiency should therefore "'be confined to cases where the
prosecution's failure is clear.'" Smith, 294 F.3d at 477 (quoting
United States v. Leon, 739 F.2d 885, 891 (3d Cir.1984)).


    B.    Motion for a New Trial Under Rule 33

      Defendant contends that a new trial should be ordered
based on: (1) an error in the jury instructions; (2) the Court's
decision to deny Defendant's line of questioning of two
government agents; and (3) the Court's decision to deny
Defendant's motion to suppress evidence obtained from Defendant's
car and home.

18

1. <u>Error in the Jury Instructions</u>

Defendant argues that the Court erred in rejecting a defense request for a "spoliation charge" with regard to information contained on Defendant's cell phones. In evaluating alleged errors in jury instructions, the court is to "consider the totality of the instructions and not a particular sentence or paragraph in isolation." <u>United States v. Khorozian</u>, 333 F.3d 498, 508 (3d Cir. 2003) (quoting <u>United States v. Coyle</u>, 63 F.3d 1239, 1245 (3d Cir. 1995)). "Moreover, in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial" since "isolated statements . . . seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial." <u>United States v. Park</u>, 421 U.S. 658, 674-75 (1975) (internal marks omitted) (quoting <u>United States v. Birnbaum</u>, 373 F.2d 250, 257 (2d Cir. 1967)).

Where the alleged error is that the court failed to give a requested instruction, error only lies "if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced the defendant." <u>United States v. Davis</u>, 183 F.3d 231, 250 (3d Cir. 1999). Furthermore, to the extent the defendant failed to

object at trial, the contested jury instruction is reviewed for plain error only. See Virgin Islands v. Knight, 989 F.2d 619, 631 (3d Cir. 1993). Under this standard, the instruction at issue is only reversible if the error is "particularly egregious" such that it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

Defendant contends that the Court erred in failing to give a "spoliation charge" concerning whether government agents spoiled the audio and video recordings on Defendant's cell phones. Defendant failed to timely object to the alleged error and it is therefore reviewed for plain error. Spoliation of evidence constitutes "the intentional destruction of evidence by an affected party." United States v. Copeland, 321 F.3d 582, 597 (6th Cir. 2003). A request for a spoliation instruction is properly denied when there is no evidence of bad faith conduct by the government. See United States v. Suarez, No. 09-932, 2010 WL 4226524 (D.N.J. Oct. 21, 2010)(adopting civil standard to select a spoliation instruction in a criminal case because there is little criminal case law in the Third Circuit regarding application of adverse inference instructions based on spoliation of evidence). The key considerations for determining the appropriate spoliation sanction (for example, dismissal,

suppression, fines, or an adverse inference instruction) are: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994).

Here, the Defendant has pointed to no evidence of bad faith conduct by the government in either his oral request for a spoliation instruction or his post-trial motions. Defendant speculates that as Agent Toledo took possession of the cell phone and was the first to attempt to extract conversations from the phone, the jury should have had the opportunity "to consider if the agent had erased the conversations which he found to be incriminating." (Doc. no. 94 at 7.) However, Agent Toledo testified that when he tried to execute the warrant to search the Lotus phone for video and audio recordings, he was asked to enter a four-digit pin and as he did not know the pin he could not access the recordings. (Doc. no. 81, 11:1-4.) Defendant did not present any evidence to doubt the veracity of Agent Toledo's statements nor evidence that anyone else had tampered with the cell phone evidence.

Furthermore, Defendant has not indicated how the absence of these recordings prejudices his case. Even presuming these recordings established that Agent Toledo entered Defendant's car before the K-9 unit arrived, the Court previously ruled in both the hearing to suppress and the hearing to re-open the suppression hearing that this fact is irrelevant to the assessment of Defendant's Fourth Amendment rights against unreasonable searches and seizures. As the Defendant had lawfully been placed under arrest, the Court held that under Gant, Agent Toledo was authorized to search the vehicle without a warrant even before the K-9 unit arrived because he had reason to believe that it contained evidence of the offense of arrest, that is drug trafficking. (Doc. No. 76, 23:25-24:1-22.)

Given the evidence on the record, the Court's decision to decline to give the spoliation instruction was not plain error[4] because it did not seriously affect the fairness,

_____

[4] Even if counsel was not required to object and the contested lack of a jury instruction would not be subject to the plain error standard upon review, there was still no error in the Court's decision not to include the spoliation charge. See Smith v. Borough of Wilkinsburg, 147 F.3d 272, 277 (3d Cir. 1988) (holding that "[i]n this circuit it is clear that by filing and obtaining a ruling on a proposed instruction a litigant has satisfied Rule 51." (citing Bowley v. Stotler & Co., 751 F.2d, 641, 646 (3d Cir. 1985)). Defendant presented no account outside of speculation of the government's bad faith, nor did he explain how the absence of these alleged audio and video recordings prejudiced his case. Therefore, since the Court did not commit an error in refusing to include the spoliation charge, the Defendant was not deprived of a fair trial and this is not a proper basis

integrity or public reputation of the judicial proceedings. Defendant was not entitled to the requested instruction, it was no error not to give it, and it is not grounds for ordering a new trial.

### 2. Line of Questioning

At trial, the Court denied the Defense permission to question two government agents as to their knowledge of whether other homeowners owned 9-millimeter, Kel-Tek handguns, whether the agents themselves owned guns, and whether each knew what the Defendant knew or expected on September 13, 2010. Defendant contends that he was entitled to elicit evidence from the agents to support his theory of the case that the gun had been planted, as a homeowner would be unlikely to keep a gun in the house "in such a curious location." (Doc. no. 94 at 6).

Raising the same argument that the Court already considered and rejected, Defendant continues to insist that the Court's evidentiary rulings deprived him of the opportunity to elicit evidence that the gun had been planted. However, Defendant has not provided any new arguments as to the possible relevance of these questions or established Special Agents Jenkins' or Costobile's personal knowledge of the potential answers. See Fed.

_____

for granting Defendant's Rule 33 motion.

R. Evid. 401, 602. At trial, the Court suggested that perhaps Ms. Vasquez might have knowledge of Defendant's proclivities regarding guns but agreed with the government that there was no foundation for asking such questions of the special agents. (Doc. No. 78, 92:5-93:11, 129:1-18.) Of course, if the Defendant wanted to suggest that he could not have placed the gun under the coffee table, he could have argued to the jury that the agents' testimony was not credible. Id. at 93:4-11.

As Defendant's substantial rights were not impacted by the Court's foreclosure of these questions, the Defendant is not entitled to a new trial on these grounds.

### 3. The Court's Decision to Deny Defendant's Motion to Suppress

Defendant argues that the Court erred in denying his Motion to Suppress and also erred in refusing to re-open the Motion to Suppress after the Court's initial decision when it ruled that police had reasonable suspicion to stop Defendant's car on September 13, 2010 and that this reasonable suspicion elevated to the level of probable cause to arrest the Defendant before the K-9 unit arrived. First, Defendant argues that Arizona v. Gant does not control the factual scenario at hand, and therefore, Agent Toledo illegally searched Defendant's vehicle before the K-9 unit arrived. Second, Defendant argues that Agent

Toledo's testimony that he never contacted the confidential informant before the K-9 unit arrived is false and the Court erred in refusing a defense request for production of Agent Toledo's cell phone records to corroborate this fact. Based on a review of the parties' submissions, the Court did not err in denying Defendant's motion to re-open the hearing and obtain Agent Toledo's cellphone records.

Defendant testified that, at the time his automobile was stopped, he possessed two cell phones. After being stopped, Defendant stated that he placed one of the cell phones into the video-audio recording mode to capture his conversations with the police officers. He testified that he placed this phone in the center console so it would continue to record even if he was removed from the vehicle. Further, Defendant stated that he used the other cell phone to make a call to a female friend Dominique Brower and advised her of the situation. Defendant kept this call running so Ms. Brower could hear everything. He also placed this phone in the center console so it could pick up all conversations, even any conversations after he was removed from the vehicle.

Defendant stated that Ms. Brower heard, prior to the K-9 unit's arrival, an individual in the car and an individual making a phone call asking where something was located in the

vehicle. Ms. Brower was prepared to testify before the Court.
Defendant states that Ms. Brower's testimony would have shown
that Agent Toledo was, in fact, in the vehicle prior to arrival
of the K-9 unit and called the confidential information prior to
the arrival of the K-9 unit.

The Defendant claims that the Court's reliance on <u>Gant</u>
was error because in this case, "there was no valid arrest,"
which preceded the K-9 search of his car. Specifically, Defendant
asserts that "he could hardly be arrested for **suspicion** of
committing a crime," and therefore, Agent Toledo would have been
acting illegally in entering the car prior to the existence of
probable cause.

On June 2, 2011, the Court denied Defendant's motion to
re-open the suppression hearing. In the instant motion, the
Defendant again challenges the Court's ruling that Agent Toledo
was authorized to search the Defendant's vehicle without a
warrant. The present motion is, in substance, a motion for
reconsideration. A proper motion for reconsideration serves to
correct manifest errors of law or fact or to present newly
discovered evidence. <u>Max's Seafood Café v. Quinteros</u>, 176 F.3d
669, 677 (3d Cir. 1999) (citing <u>North River Ins. Co. v. CIGNA
Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir.1995)). Such a motion
may be granted only if: 1) there has been an intervening change

in the controlling law; 2) new evidence has recently become available; or 3) it is necessary to correct a clear error of law or to prevent manifest injustice. Drysdale v. Woerth, 153 F. Supp. 2d 678, 682 (E.D. Pa. 2001) (citing United Lawnmower Sales & Service, Inc. v. Hagel, Civ. A. No. 95-6157, 1997 WL 327564, at *2 (E.D. Pa. June 12, 1997)). A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of. Drysdale, 153 F. Supp. 2d at 682 (citing Moyer v. Italwork, Civ. A. No. 95-2264, 1997 WL 312178, at *3 (E.D. Pa. June 3, 1997)).

Defendant's arguments have not changed since the Court last considered them. The law has not changed, no newly discovered facts have been alleged, and nothing has occurred that would make the Court reverse its previous decision that the officers' initial stop of Defendant's vehicle was justified by reasonable suspicion, and later as a consequence of additional information, the officers had probable cause to arrest Defendant for engaging in a narcotics transaction. (Doc. no. 76, 23:17-25.) The Defendant simply reformulates his previous arguments with the one exception that Defendant now argues that the government did not have sufficient probable cause to arrest the Defendant.[5]

---

[5] In his Motion to Re-open the Suppression Hearing, Defendant argued that he had never been placed under arrest and therefore Arizona v. Gant, 556 U.S. 332 (2009), was inapplicable. (Doc. no. 54 at 1) ("To advance this argument the government relies upon

The Court's memorandum denying the motion to suppress indicates that the Court found that the officers had probable cause to believe Defendant had committed or was committing a drug offense thus justifying Defendant's arrest prior to the arrival of the K-9 unit. Specifically, the Court previously held that the factors which gave rise to reasonable suspicion—that is, the tip from the informant, the counter-surveillance activity, the sixteen-minute meeting in Defendant's car-plus the companion's flight immediately after meeting in the Defendant's car, as well as Defendant's visible nervousness upon contact with the police, when viewed together gave rise to probable cause. (Doc. No. 37 at 18). Accordingly, the Court later reasoned that <u>Arizona v. Gant</u> governed the factual circumstances as the Defendant had been lawfully placed under arrest and the officers could search the vehicle incident to arrest for evidence of the offense of arrest. (Doc. No. 76, 23:12-24:22.)

Even if the Court determined that Agent Toledo was in Defendant's car and spoke to the confidential informant prior to the arrival of the K-9 unit, that would have no bearing on the

the Supreme Court's holding in <u>Arizona v. Gant</u>, 129 S. Ct. 1710 (2009). In <u>Gant</u> the Supreme Court held that the police may search the passenger compartment of a vehicle incident to a recent occupants [sic] arrest if it is reasonable to believe that the vehicle contains evidence of the offense of arrest. The flaw in the government's argument is that defendant Pitts was not under arrest at the point in time when Agent Toledo entered into the car and began to search it.")

outcome of the motion for a new trial because Agent Toledo's search of the vehicle was consistent with <u>Arizona v. Gant</u>. 556 U.S. 332 (2009). At the point probable cause came to fruition and the Defendant had been arrested, Agent Toledo was authorized to search the vehicle without a warrant because he had reason to believe that it contained evidence of the offense of arrest, that is drug trafficking. <u>Id.</u>

No clear error or manifest injustice has occurred and thus, the Court's decisions to deny Defendant's Motion to Suppress and Motion to Re-Open the Suppression Hearing are not grounds for ordering a new trial.

A.   Renewed Motion for a Judgment of Acquittal Under Rule 29

The Defendant contends that the evidence was insufficient to support his conviction on Count Two, charging possession with intent to distribute crack cocaine, and Count Four, charging possession of a firearm in connection with a drug distribution offense. The facts of this case and a review of the relevant case law satisfy the Court that the evidence supports Defendant's convictions on both counts.

1.   <u>Count Two: Knowingly and Intentionally Possessing Crack Cocaine With Intent to Distribute in Violation of 21 U.S.C. § 841(a) (1), (b)(1)(C).</u>

Defendant argues that the evidence was insufficient to support his conviction for possession of crack cocaine with the intent to distribute. To obtain a conviction on the § 841(a) count, the government had to prove beyond a reasonable doubt the Defendant knowingly or intentionally possessed crack cocaine, with the intent of distributing it. 21 U.S.C. § 841(a). The government could prove both Defendant's possession of these controlled substances and his intent through circumstantial evidence. <u>See</u> <u>United States v. Johnson</u>, 302 F.3d 139, 149 (2002); <u>United States v. Voigt</u>, 89 F.3d 1050, 1090 (3d Cir. 1996); <u>United States v. Blackston</u>, 940 F.2d 877, 891 (3d Cir. 1991).

Viewed favorably to the government, the evidence is sufficient for a reasonable jury to conclude beyond a reasonable doubt that the Defendant possessed crack cocaine with intent to distribute. Philadelphia Police Detective James Wood testified about finding what expert DEA Chemist Astrakhan concluded was 0.62 grams of crack cocaine in the kitchen of Defendant's home. (Doc. no. 77, 198:9-199:10; 218:14-220:7). Special Agent Updegraff testified that he could not determine whether the quantity of crack cocaine found was held for the purposes of distribution. He also testified that there were several different methods for using crack cocaine personally, such as with a crack pipe. (Doc. no. 78, 177:8-19.) According to Agent Toledo the

30

searches of Defendant's home and automobiles uncovered no evidence of personal use of cocaine, crack cocaine or marijuana. Id. 224:18-225:19. Agent Toledo also testified that during the traffic stop of Defendant's car, Defendant told him that he did not personally do drugs. Id. 213:17-214:3.

Ms. Vasquez testified that not only had she never kept any drugs or guns in the house, but also that she had never seen the Defendant use cocaine powder, crack cocaine, or marijuana, and the Defendant never told her that he used any of those drugs.(Doc. no. 77, 228:25-229:24, 233:11-15.) Defendant corroborated her testimony on cross-examination by testifying that at the time of the traffic stop, he was not personally using crack cocaine, cocaine powder, or marijuana, and had no intention to start using any of those drugs. (Doc. no. 79, 166:6-168:4) He further stated that any controlled substances found in his car and home would not have been for his personal use. Id.

Based on the aforementioned evidence, a reasonable jury could find that the Defendant knowingly possessed crack cocaine and that he did so with the intent to distribute. The evidence allowed the jury to conclude that the Defendant was the sole occupant and resident of the property on 6528 Marsden Street and that therefore any contraband found therein would have been under his possession. Furthermore, as the Defendant and several

witnesses attested to the fact that the Defendant did not personally use crack cocaine, the jury could have inferred that he intended to distribute it to other people. Accordingly, the Court concludes that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Defendant violated 21 U.S.C. § 841(a)(1), (b)(1)(C).

       2.    Count Four: <u>Knowingly Possessing a Firearm and Ammunition in Furtherance of a Drug Trafficking Crime in Violation of 18 U.S.C. § 924(c)(1).</u>

Defendant contends that the evidence was insufficient to support the Defendant's conviction for possession of a firearm in connection with a drug distribution offense because an insufficient nexus exists between the two.

Under § 924(c), the government had to prove beyond reasonable doubt that: (1) the Defendant committed at least one of the crimes of possession with intent to distribute a controlled substance as charged in Counts One, Two, and Three of the indictment; (2) the Defendant knowingly possessed a firearm; and (3) that the possession was in furtherance of possession with intent to distribute a controlled substance, as alleged in the indictment. As the Defendant does not challenge the sufficiency of the evidence with respect to Counts One and Three, only the second and third elements are in dispute here.

a.  <u>Knowing possession of a firearm</u>

The government must establish that the Defendant actually or constructively possessed the firearm. Because the firearm was not recovered from Defendant's person, the government must establish constructive possession. To establish constructive possession the government must prove that the defendant knew of the object and had control over it. In United <u>States v. Brown</u>, the Third Circuit held that:

> Although the government need not show proof of actual possession, to show 'constructive' possession of an illegal substance the government must submit sufficient evidence to support an inference that the individual "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both 'dominion and control' over an object and knowledge of that object's existence."

3 F.3d 673, 680 (3d Cir. 1993)(quoting <u>United States v. Iafelice</u>, 978 F.2d 92 (3d Cir. 1992)); <u>see also</u> <u>United States v. Heilman</u>, 377 F. App'x 157 (3d Cir. 2010) (non-precedential) (affirming firearm possession charges based on constructive possession due to the locations of the recovered weapons at residences the defendant shared with other individuals). Dominion and control need not be exclusive, but can be shared with others. <u>Brown</u>, 3 F.3d at 680. However, "mere proximity to the [gun], or mere presence on the property where it is located or mere association

33

with the person who does control the [gun] or the property, is insufficient to support a finding of possession." Id.

Whether a defendant had dominion and control over weapons found in a house hinges in part on his relationship to that property. If a defendant is an owner or lessee of a premises where contraband is found, that fact "logically tend[s] to support a conclusion that [he or she] had constructive possession" of any contraband on the premises. United States v. Introcaso, 506 F.3d 260, 271 (3d Cir. 2007); see Jackson v. Byrd, 105 F.3d 145, 150 (3d Cir. 1997). Here, Special Agents Jenkins testified that he found a loaded, 9-millimeter Kel-Tek handgun under a coffee table in Defendant's living room.[6] (Doc. no. 78, 72:16-73:24, 75:1-77:12.) Special Agent Costobile testified that he also found a gun holster in Defendant's bedroom, and that the gun found by Special Agent Jenkins fit perfectly in the holster. Id. at 115:3-21, 125:2-14. Although Defendant denied the gun was his and asserted that the confidential informant planted the firearm, the building's only other resident, Ms. Vasquez, said she never kept a gun in the house. (Doc. no. 76, 228:25- 229:17.) Furthermore, Special Agent Updegraff as an expert testified that

---

[6] The government and its witnesses as well as the Defendant refer to 6528 Marsden Street as Defendant's home or residence, but no party asserts whether he did or did not lease the premises. Ms. Vasquez testified that she owned the home but that on September 13, 2010, only the Defendant was living at the residence.

drug traffickers often use guns in connection with their drug trafficking, sometimes to protect themselves, their proceeds, and their illegal drugs from rival traffickers, and that the drug traffickers do not often carry their guns or store them near the contraband or drug proceeds; and that the key is accessibility. (Doc. no. 78, 156:9-158:7.)

Based on the location of the weapon, the other materials recovered during the searches and lay and expert witness testimony, a reasonable jury could have concluded that Defendant exercised dominion and control over the premises and the firearm therein. The evidence also supports the conclusion that Defendant knew the firearm was present in his home. This is not a case of mere proximity or mere knowledge. See Brown, 3 F.3d at 680. Accordingly, as a reasonable jury could have found beyond a reasonable doubt that Defendant constructively possessed the firearm, a judgment of acquittal is not appropriate on this ground.

b. "In Furtherance" of drug trafficking

In United States v. Sparrow, the Third Circuit held that under § 924(c) "mere presence" of a gun is not enough to establish a nexus and that instead "the evidence must demonstrate that possession of the firearm advanced or helped forward a drug

35

trafficking crime." 371 F.3d 851, 853 (3d Cir. 2004); <u>see also</u>
H.R. Rep. No. 105-344, at 12 (1997) (noting that the prosecution
must "clearly show that a firearm was possessed to advance or
promote the commission of the underlying offense"). The Third
Circuit set forth the following nonexclusive list of factors that
are relevant to establish a connection between guns and drug
trafficking activities for purposes of charges brought under §
924(c): the type of drug activity, the accessibility of the
weapon, whether the weapon is stolen, whether possession of the
weapon is legitimate or illegal, whether the weapon is loaded,
proximity to drugs recovered, and the time and circumstances of
recovery. <u>Id.</u>

Defendant bears a "heavy burden" in challenging the
sufficiency of the evidence supporting a conviction. With respect
to the evidence on the record, the <u>Sparrow</u> factors indicate that
Defendant's possession of the 9-millimeter Kel-Tek handgun was
used to further his drug-trafficking activities. First, the
expert testified that the key was accessibility and given that
the firearm was retrieved in close proximity to the door it could
have been easily accessible to any person in the residence.
Second, as a convicted felon, Defendant was prohibited from
owning a firearm. Third, the firearm was loaded. Fourth, the
firearm was recovered during the execution of a duly authorized

warrant. Thus, the jury heard sufficient evidence to conclude rationally that the Defendant knowingly possessed a gun in furtherance of his drug trafficking.

In sum, the Court finds that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Defendant violated § 924(c).

**IV.  CONCLUSION**

Based on the aforementioned, Defendant's post-trial motions will be **DENIED.** An appropriate order will follow.